The PEOPLE of the State of Colorado, Petitioner–Appellant,

v.

Donna TAYLOR, Respondent–Appellee.

No. 79SA67.

Supreme Court of Colorado, En Banc.

Oct. 27, 1980.

---

Terrance Farina, Dist. Atty., Arthur R. Smith, Chief Deputy Dist. Atty., Grand Junction, for petitioner–appellant.

Nelson, Hoskin, Groves & Prinster, P. C., Jon E. Getz, William H. Kain, III, Grand Junction, for respondent–appellee.

Lawrence W. Treece, Denver, for Colorado Lawyers Committee, amicus curiae.

Anthony F. Renzo, Denver, for ACLU Foundation, amicus curiae.

Randall Swanson, James Dean, Denver, for Legal Aid Society of Metropolitan Denver, Inc., amicus curiae.

Betty L. Nordwind, Denver, for Colorado Bar Office for the Mentally Disabled, amicus curiae.

ROVIRA, Justice.

This is an appeal from the district court's dismissal of the proceeding to confirm the certification of the respondent, Donna Taylor, for short–term treatment at the Colorado State Hospital, pursuant to section 27–10–107, C.R.S.1973. In response to a motion filed by respondent, the trial court ruled that the Colorado statutes providing for an individual's involuntary psychiatric treatment in a confined institutional setting are unconstitutional, that due process entitles the respondent to the constitutional privilege against self–incrimination,[1] and that, under the circumstances of this case, the respondent is entitled to assert the statutory physician–patient privilege.[2] We affirm in part and reverse in part.

I.

The respondent is an adult who was being seen by Dr. Gird Leopoldt on an out–patient basis at the Mesa County Mental Health Center in Grand Junction. With the active encouragement of her family, she voluntarily entered St. Mary's Hospital for more intensive psychiatric treatment on September 26, 1978. At the time she entered this closed setting, Miss Taylor had a long history of psychiatric illness and of frequent hospitalizations.

---

1. *See U.S.Const.* amend. V and *Colo.Const.* art. II, sec. 18. As discussed in Part V of this opinion, *infra*, the scope of the district court's ruling included giving the respondent immunity from being called as an adverse witness at her certification hearing and a finding that she had a right to be absent from the hearing itself unless her presence was necessary for some "nontestimonial" evidentiary purpose. The district court would also have applied this constitutional privilege to exclude from evidence any information that her psychiatrist obtained from her during the course of her treatment. We do not reach this precise question here.

2. *See* section 13–90–107(1)(d), C.R.S.1973 (1979 Supp.). The district court held in its oral ruling on the respondent's motion to dismiss

that the statutory privilege was available to her as well as the constitutional privilege against self–incrimination. In its memorandum order, the court does not specifically address this issue. Nevertheless, we treat it as implicit in the court's decision of the more expansive constitutional safeguard. Because we affirm the court's ruling on the availability of the statutory physician–patient privilege, it is not essential to the disposition of this case to determine whether the constitutional privilege is unavailable in every circumstance to the respondent in a civil commitment proceeding. *See Friedman v. Motor Vehicle Division,* 194 Colo. 228, 571 P.2d 1086 (1977); *Kirk v. Douglas,* 176 Colo. 104, 489 P.2d 201 (1971).

On October 12, 1978, Dr. Leopoldt filed a Notice of Certification and Certification for Short–Term Treatment at the Colorado State Hospital with the district court, a copy of which was served on respondent. Section 27–10–107, C.R.S. 1973. He alleged that respondent was mentally ill and, as a result, gravely disabled, and that, despite her acceptance of voluntary treatment, he had reasonable grounds to believe that she might not remain in a voluntary program.

In his certification, Dr. Leopoldt made no claim that Miss Taylor was actively dangerous to herself or to others. He described her behavior as becoming "increasingly bizarre," and he had formed the opinion that her psychiatric condition was deteriorating. He further noted that she could not "engage in meaningful conversation with others, stays in her bed, mumbles incoherently and tends to gesture to herself."

On October 16, 1978, the respondent moved the court to dismiss the Certification for Short–Term Treatment. This motion was argued on October 25, 1978, at which time the People made an offer of proof that: (1) the respondent had been diagnosed as a schizophrenic of the "affective type"–subject to inappropriate mood swings between "hyperactivity" and severe depression; (2) before her most recent hospitalization, her inattention to burning cigarettes, candles, and stoves had caused a danger of fire on more than one occasion; (3) she ignored her personal appearance and hygiene, gave up cooking meals, and remained in bed for prolonged periods; (4) during her phases of overactivity, she often became incontinent and was an active nuisance to strangers, calling them by telephone at late hours, roaming her neighborhood clad only in a robe and barefoot, collecting articles of trash which she believed had value. The People argued that the respondent was "dangerous" in the sense that she was unable to care for her basic personal needs.

The district court granted the respondent's motion to dismiss holding that: (1) the definitions of "gravely disabled" contained in section 27–10–102(5), C.R.S.1973 (1979 Supp.), and "mentally ill person" contained in section 27–10–102(7), C.R.S.1973, are unconstitutionally vague and overbroad; (2) the respondent's constitutional right to procedural due process would be denied if she were tried under the standard of proof specified for hearings conducted under section 27–10–111(1), C.R.S.1973 (1979 Supp.); (3) on the facts of this case, respondent posed no imminent and substantial danger to herself or to others and, therefore, it would be unconstitutional to deprive her of liberty for purposes of treatment; and (4) the respondent was entitled to claim a privilege against self–incrimination of the same scope as one who is subject to a criminal prosecution.

## II.

The district court held that the statutory definitions of a "mentally ill person" and of the condition of being "gravely disabled" are not sufficiently certain and definite in their meanings to meet constitutional standards. A mentally ill person is defined as one "who is of such mental condition that he is in need of medical supervision, treatment, care, or restraint." Section 27–10–102(7), C.R.S.1973. The statute nowhere attempts to classify the types or causes of the "mental condition" that may create a need for medical intervention. The district court also invalidated that portion of section 27–10–102(5), C.R.S.1973 (1979 Supp.), which declares that being gravely disabled is a condition "in which a person, as a result of mental illness, is unable to take care of his basic personal needs." [3] The court reasoned

---

3. The definition of "gravely disabled" contained in section 27–10–102(5), C.R.S.1973 (1979 Supp.), is divisible into two parts, only one of which is at issue in this appeal. The whole section provides:

 " 'Gravely disabled' means a condition in which a person, as a result of mental illness, is unable to take care of his basic personal needs or is making irrational or grossly irresponsible decisions concerning his person and lacks the capacity to understand this is so. A person of any age may be "gravely disabled" under this definition, but the term does not include mentally retarded persons by reason of such retardation alone."

that such matters as incontinence, which implicate basic personal needs and thus seem within the statutory language, are not in themselves enough to justify involuntary hospitalization.

■ Where a statute is alleged to be unconstitutionally vague, a court must look to its purpose and context in evaluating the standards it sets down. *Mr. Lucky's, Inc. v. Dolan*, 197 Colo. 195, 591 P.2d 1021 (1979). Only when these standards are so inexplicit that a danger of arbitrary and capricious enforcement exists, or when the statutory language is phrased so that it does not give fair warning what conduct is being regulated will the statute be held unconstitutional on its face. *LDS, Inc. v. Healy*, 197 Colo. 19, 589 P.2d 490 (1979).

In drafting legislation total precision of expression is frequently impossible. *Weissman v. Board of Education*, 190 Colo. 414, 547 P.2d 1267 (1976); *People v. Blue*, 190 Colo. 95, 544 P.2d 385 (1975). A close scrutiny of the language in question here, in light of the purpose and context of the statutory enactment providing for short-term treatment, demonstrates that the statute gives adequate notice to persons of common intelligence of what type of conduct is being regulated and provides procedures to minimize the risk of arbitrary interpretations and enforcement.

■ In adopting provisions for the care and treatment of the mentally ill, the legislature has declared that a person not be deprived of liberty unless "less restrictive alternatives are unavailable and only when his safety or the safety of others is endangered." Section 27–10–101(1)(b), C.R.S. 1973. The legislature intended that its provisions be liberally construed to protect the autonomy, dignity, and privacy of the individuals whose conduct it regulates. *See* section 27–10–101(2), C.R.S.1973. Such concerns reflect and temper the traditional justifications for a legislature's power to authorize civil commitment: (1) under circumstances where an individual is unable to take care of himself and his safety is at stake, the state may act as *parens patriae* and deprive him of liberty for purposes of care and treatment; and (2) one whose mental illness renders him dangerous may be deprived of liberty under the state's police power. *See People v. Lane*, 196 Colo. 42, 581 P.2d 719 (1978).

■ It is axiomatic that a finding of mental illness alone can never be a justification for a person's involuntary confinement. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1976). The Colorado short–term treatment procedure requires that a causal nexus be established between a person's mental illness and the condition of being a danger to others or to himself or gravely disabled.[4] A variety of judgments are brought to bear on deciding this question of causation. It is necessary that the professional treatment and evaluation staff find, after analysis, that the person for whom certification is sought is "mentally ill and, as a result of mental illness, a danger to others or to himself or gravely disabled." Section 27–10–107(1)(a), C.R.S.1973.[5] But before involuntary care and treatment can be ordered, a court or jury must also determine that the person is "mentally ill and, as a result of such mental illness, a danger to others or to himself or gravely disabled." Section 27–10–111(1), C.R.S.1973 (1979 Supp.). Thus the statutory procedure brings both the educated opinion of the expert and the common sense judgment of the judge or jury to bear on whether short–term involuntary treatment is necessary. This procedure, involving a mixture of medical and social or legal judgments, was obviously adopted to put a check on the discretion of the professionals responsible for deciding whether certification is justified. *See Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972).

4. *See* sections 27–10–107(1)(a), C.R.S.1973, and 27–10–111(1), C.R.S.1973 (1979 Supp.).

5. A "professional" person, under section 27–10–102(11), C.R.S.1973, is one who is "licensed to practice medicine in this state or a psychologist certified to practice in this state."

Although some professional persons might be of the opinion that a wide range of people are "in need of medical supervision, treatment, care, or restraint,"[6] this statutory definition of mental illness, on its own terms, cannot be read to intend that every idiosyncratic or eccentric person *requires* involuntary medical intervention. Mere disability alone, even if found in conjunction with mental illness, is not enough to warrant involuntary commitment. Rather, this disability must arise as a *result* of the mental illness; and in keeping with the statutory purpose, it must be so grave that the person's safety is threatened by his inability "to take care of his basic personal needs."[7] We reverse the district court's ruling that the statute is facially unconstitutional.

The phrase "basic personal needs" is not specifically defined in the statutes. But such specificity is not constitutionally mandated if a person of ordinary intelligence would readily comprehend its import. *People v. Blue, supra.* Considering the legislature's intention to limit involuntary short–term treatment to those situations where the individual's well being or the public's safety is at stake, and also considering its emphasis on avoiding improper interference with individual privacy, we interpret "basic personal needs" to mean those fundamental necessities of human existence, such as food, shelter, clothing, and medical care, which an individual must obtain and maintain in order to live safely. This standard, when seen in relation to the definition of mental illness, the causal connection established between these concepts, and the requisite statutory certification procedures, serves to circumscribe the class of individuals who come within its terms.

When perceived in their whole statutory context, the definitions of mental illness and of the condition of being gravely disabled (unable to take care of basic personal needs) are sufficiently clear and definite to apprise both lay and professional persons of the type of conduct necessary for certification for short–term treatment. Constitutional due process requires no more. *See, e. g., People in the Interest of K.P.*, 182 Colo. 409, 514 P.2d 1131 (1973).

## III.

The district court held that, in a hearing to decide whether a person should be detained for short–term treatment for a period not to exceed three months, the "clear and convincing" standard of proof specified in section 27–10–111(1), C.R.S.1973 (1979 Supp.), was inadequate to protect a person's right to procedural due process under the *U.S.Const.* amend. XIV and *Colo. Const.* art. II, sec. 25. The court concluded that the standard of proof in certification hearings should be the same as that constitutionally required in criminal and juvenile delinquency proceedings–beyond a reasonable doubt. *See Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D.Wis.1972), *vacated and remanded for a more specific order*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *order on remand*, 379 F.Supp. 1376 (1974), *vacated and remanded on other grounds*, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *order reinstated on remand*, 413 F.Supp. 1318 (1976);[8] *Superintendent of Worcester State Hospital v. Hagberg*, 374 Mass. 271, 372 N.E.2d 242 (1978); *see also In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.3d 368 (1970); *People in the Interest of C.B.*, 196 Colo. 362, 585 P.2d 281 (1978) (the "beyond a reasonable doubt" standard governs juvenile probation revocation hearings). We are persuaded that the standard of proof fixed by the legislature meets minimum standards of procedural due process, and so we reverse the ruling below.

---

**6.** Section 27–10–102(7), C.R.S.1973.

**7.** *See* sections 27–10–107(1)(a) and 27–10–111(1), C.R.S.1973 (1979 Supp.).

**8.** An obvious implication of *Addington v. Texas, infra*, has been to overrule this case in its

holding that the standard of proof in state civil commitment hearings must be beyond a reasonable doubt. *See Suzuki v. [Alba] Yuen*, 438 F.Supp. 1106 (D.Haw.1977), *rev'd in part*, 617 F.2d 173 (9th Cir. 1980).

Our consideration of this issue has been guided by authority which was unavailable to the district court when it made its ruling. In *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the United States Supreme Court addressed this question in relation to the *U. S. Const.* amend. XIV and held that an indefinite commitment to a state mental hospital may be justified on the basis of a "middle level of burden of proof that strikes a fair balance between the rights of the individual and the legitimate concerns of the state." *Id.* at 431, 99 S.Ct. at 1812. The statutory provision requiring "clear and convincing evidence" for hearings to determine certification for short–term treatment under section 27–10–111(1), C.R.S.1973 (1976 Supp.) is at least equal to that which meets the due process standard set down in *Addington v. Texas, supra.* We are not persuaded that the Colorado Constitution demands the imposition of any more rigorous standard.

 Due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). There can be no doubt that involuntary commitment to a mental hospital is a deprivation of liberty which the state cannot accomplish without procedural safeguards. *O'Connor v. Donaldson, supra* (Berger, C. J., concurring). *See In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Since certification under section 12–10–107, C.R.S.1973, carries a possibility of confinement within a treatment facility for up to three months, the proper standard of proof in a short–term certification hearing is found by balancing the individual's interest in not being confined against the state's interest in providing care and treatment, while minimizing the risk of erroneous decisions. *Addington v. Texas, supra; see Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

The hearing procedure at issue here [9] is to be conducted "in the same manner as other civil proceedings" before the district court.

The burden of proof has been placed upon those seeking to detain the respondent, and the court or jury must be persuaded by "clear and convincing evidence" that the conditions for involuntary care and treatment are met. This standard is to be contrasted to the "preponderance" standard that prevails in civil cases generally and to the standard of proof "beyond a reasonable doubt" which is required when state power is exercised in a punitive sense. *See In re Winship, supra.* Such standards of proof have both symbolic meaning and a very practical effect. For an increase in the burden of proof is "one way to impress the fact finder with the importance of the decision and ·thereby perhaps to reduce the chances that inappropriate commitments will be ordered." *Addington v. Texas, supra,* 441 U.S. at 427, 99 S.Ct. at 1810.

 The preponderance standard directs the fact finder to decide whether the existence of a contested fact is "more probable than its nonexistence." *Page v. Clark,* 197 Colo. 306, ——, 592 P.2d 792, 800 (1979), quoting *McCormick, The Law of Evidence* § 339 (2d. ed. 1972); *People v. Lane, supra.* Under this standard, where evidence weighs evenly on both sides in a controversy, the fact finder must resolve the question against the party who has the burden of proof. See *Colo. J.I.* (Civ.2d) 3:1. The legislature has not asked the individual subject to a "massive curtailment of liberty" [10] through involuntary confinement to share equally the risk of error which proof by mere preponderance entails. Due process requires the state to justify confinement by a more substantial probability. *Addington v. Texas, supra.*

The state's interest in certifying an individual for short–term treatment is to provide care to one whose mental condition poses a threat to society or to the person himself. Unlike the criminal defendant whose victory at trial means freedom, the individual who is suffering from mental illness of the serious kind contemplated by

___

9. *See* section 27–10–111(1), C.R.S.1973 (1979 Supp.).

10. *See Humphrey v. Cady, supra,* 405 U.S. at 509, 92 S.Ct. at 1052.

the statutes is, in a real sense, "neither wholly at liberty nor free of stigma" whatever the outcome of the certification hearing. *See Addington v. Texas, supra*, 441 U.S. at 429, 99 S.Ct. at 1811. Confinement itself is only one alternative for the individual who has been found mentally ill and, as a result, a danger to others or to himself or gravely disabled. But more significantly, the central issue at a certification hearing is not the straight–forward factual determination of guilt or innocence which is the focus of a delinquency proceeding or a criminal prosecution. *Addington v. Texas, supra*. A finding of "mental illness" is heavily influenced by an interpretation of facts offered into evidence by psychiatrists or psychologists. Because the "subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations," and because predictions of future behavior are inherent in showing that medical intervention is mandated by the circumstances, it would be a "serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous." *Id.* 441 U.S. at 429, 99 S.Ct. at 1811; *O'Connor v. Donaldson, supra* (Berger, C. J., concurring); *see* Note, *Due Process and the Development of Criminal Safeguards in Civil Commitment Adjudication*, 42 Ford.L. Rev. 611, 623–625 (1974). So we conclude that in a hearing to determine whether certification for short–term treatment is necessary, fundamental fairness to the respondent does not require the state to adopt a standard of proof which imposes "an obligation to perform an impossible or futile task." *People in the Interest of Y.D.M.*, 197 Colo. 403, ——, 593 P.2d 1356, 1361 (1979).

 The standard of proof adopted by the legislature for treatment strikes a fair balance between the interest of the individual and the interest of the state.[11] Proof by "clear and convincing evidence" is proof which persuades the trier of fact that the truth of the contention is "highly probable." *Page v. Clark, supra*, 197 Colo. at ——, 592 P.2d at 800. It is evidence which is stronger than a "preponderance of the evidence." *People v. Lane, supra*.[12] The clear and convincing standard thus minimizes the risk of error. It is also less rigorous in the degree of probability it demands than proof "beyond a reasonable doubt," and so it creates no "unreasonable barrier to needed medical treatment." *Addington v. Texas, supra*, 441 U.S. at 432, 99 S.Ct. at 1812–13.

### IV.

 The respondent's physician certified her for short–term treatment on the grounds that she was mentally ill and, as a result, gravely disabled. The district court construed this certification as resting on an allegation that respondent was unable to take care of her basic personal needs. The court ruled that, unless the People specifically alleged that the respondent was an imminent and substantial danger to herself or others, her short–term certification could not be constitutionally justified. It held that the People's offer to prove that the respondent was "gravely disabled" did not meet this standard. We disagree.

 The legislature has established four distinct bases to justify certification of a mentally ill person for short–term treatment. *See* section 27–10–107(1)(a), C.R.S. 1973. If it is shown that a person is mentally ill, commitment cannot be justified unless it is shown that, as a result of such illness, the person is: (1) a danger to others, (2) a danger to himself, (3) "gravely disabled" because of an inability to take care

---

11. In *Addington v. Texas, supra*, the Supreme Court upheld the "clear and convincing" standard of proof in the context of civil commitment for an *indefinite* period. This, of course, is not the precise issue raised here.

12. *See Colo. J.I.* (Civ.2d) 3:2, defining clear and convincing evidence:

"By 'clear and convincing evidence' is meant that evidence which is stronger than a 'preponderance of the evidence', and which is unmistakable and free from serious or substantial doubt."

of basic personal needs,[13] or (4) "gravely disabled" because the person is "making irrational or grossly irresponsible decisions concerning his person and lacks the capacity to understand this is so."[14] Mental retardation alone cannot justify involuntary treatment under this statute.[15]

Dangerousness to others may be shown by evidence of injurious acts, attempts, or threats. See *People v. Lane, supra.* Dangerousness to oneself may be shown by similar evidence, where the individual's injurious behavior is directed toward himself. *See, e. g., People v. Amaya,* Colo.App., 592 P.2d 1359 (1979). But the allegations in this case point toward a different kind of "danger."

The People offered to prove that the respondent's mental illness caused her to be so neglectful and careless that she posed a danger to her own health and safety.[16] At the time certification was sought, it was alleged that the respondent was unable to communicate with others and that she was self–confined in her bed at St. Mary's Hospital in Grand Junction. The People raised factual questions about the degree of danger caused by the respondent's carelessness in using fire, her lack of proper hygiene, and her intake of nourishment. It is unclear from the record to what extent third parties were available to provide the respondent with voluntary care and protection during this alleged period of mental crisis; but we assume, for the purposes of this appeal, that such care was not available when certification was sought.

The district court is to conduct hearings for certification of short–term treatment "in the same manner as other civil proceedings before such court." Section 27–10–111(1), C.R.S.1973 (1979 Supp.). In ruling upon a motion to dismiss, all material allegations of the People's petition are presumed to be true. *See McDonald v. Lakewood Country Club,* 170 Colo. 355, 461 P.2d 437 (1969); *In re Cisneros,* 163 Colo. 245, 430 P.2d 86 (1967). Passive injury to oneself, because of an inability to take care of one's most basic personal needs, may be as dangerous or damaging to the individual as the active threat posed by suicide. Assuming that the People's allegations are true and viewing their offer of proof in its most favorable light, we are of the opinion that an allegation that a person is mentally ill and, as a result of that illness, gravely disabled because of an inability to take care of basic personal needs is sufficient and need not further allege imminent and substantial danger in order to pass constitutional scrutiny. Based on their substantive allegation, the People had a right to proceed to a hearing on their petition.[17]

V.

The district court ruled that the respondent's constitutional privilege against being compelled to incriminate herself applies at a civil commitment proceeding to the same extent as it would in a criminal prosecution. *See U.S.Const.* amend. V and *Colo.Const.* art. II, sec. 18. The privilege would thus be available to the respondent to refuse to testify at the hearing if called as an adverse witness by the People, *see* section 13–90–116, C.R.S.1973, and would support her refusal to be present in the courtroom during the course of proceedings, as long as her presence was not required for such nontestimonial purposes as identification. The

---

**13.** *See* section 27–10–102(5), C.R.S.1973 (1979 Supp.).

**14.** *Ibid.* We do not address the constitutionality of this provision here.

**15.** *Ibid..*

**16.** The author of the comment *Overt Dangerous Behavior as a Constitutional Requirement for Involuntary Civil Commitment of the Mentally Ill,* 44 *U.Chi.L.Rev.* 562 (1977), remarks that three types of danger have generally been accepted as grounds for involuntary confinement of the mentally ill: "(1) injury to others, (2) active injury to self (*e. g.,* suicide), and (3) passive injury to self (*e. g.,* neglect)." *Id.* at 575.

**17.** We express no opinion on the ultimate sufficiency of the evidence in this case. Whether the respondent is unable to acquire or sustain her "basic personal needs" is a distinctly factual inquiry.

court further ruled that the physician–patient relationship would serve to bar receipt into evidence of any information Dr. Leopoldt acquired in attending her. *See* section 13–90–107(1)(d), C.R.S.1973 (1979 Supp.). The People argue not only that the constitutional privilege is inapplicable in this case, but that the legislature has removed any statutory privilege from communications that took place between respondent and Dr. Leopoldt during the course of her diagnosis and treatment.

We reverse the district court's ruling on the constitutional privilege against self–incrimination, and we affirm its ruling regarding the availability of the statutory patient–doctor privilege to the respondent.

### A.

■ The deprivation of liberty that may be the consequence of mental health commitment proceedings is similar to the deprivation of liberty in criminal proceedings; constitutional due process may therefore require the imposition of similar procedural safeguards for the individual. *See Sisneros v. District Court*, Colo., 606 P.2d 55 (1980) (due process requires strict adherence to the statutory advisement procedure for short–term certification); *Goedecke v. State Department of Institutions*, Colo., 603 P.2d 123 (1979) (due process gives the subject of a certification hearing a right to a transcript at state expense for an appeal *in forma pauperis*). Nevertheless, the distinction between civil commitment and criminal trials remains constitutionally viable. *Addington v. Texas, supra.* A due process balancing of the private and public interests must be undertaken, with an emphasis on the risks run by the individual if her interest is sacrificed erroneously. *Id.; Mathews v. Eldridge, supra.* Here the respondent's claimed substantive privilege against self–incrimination must be considered in relation "both to the problems which confront the State and to the actual character of the procedural system which the State has created." *In re Gault, supra,* 387 U.S. at 68, 87 S.Ct. at 1465 (Harlan, J., concurring in part and dissenting in part.)

■ The Fifth Amendment privilege against self–incrimination "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Baxter v. Palmigiano,* 425 U.S. 308, 316, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976), quoting *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973). Neither may the government "penalize assertion of the constitutional privilege against compelled self–incrimination by imposing sanctions to compel testimony which has not been immunized." *Lefkowitz v. Cunningham,* 431 U.S. 801, 806, 97 S.Ct. 2132, 2136, 53 L.Ed.2d 1 (1977). The touchstone of the Fifth Amendment is compulsion. *Id.*

■ In this case the respondent voluntarily sought aid from Dr. Leopoldt and voluntarily entered the closed treatment setting at St. Mary's Hospital. No official compulsion was brought upon her to speak. This was simply not a situation where the respondent was subjected to "custodial interrogation" and, thus, was entitled to a prior warning of her right to be silent before its waiver could be found. *See Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In order to resolve the issue of constitutional privilege decided by the district court, however, we must address the question of whether the respondent may claim this privilege as grounds to avoid being called as an adverse witness at her certification hearing and to avoid appearing in court.

The minimum constitutional safeguards appropriate for involuntary treatment for mental illness depend to some degree on the type and purpose of confinement which may result. *See Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)

(Powell, J., concurring) (a prisoner subject to transfer to another institution for treatment need not have a licensed attorney appointed for him as part of the hearing to determine this "medical" issue); *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (a child's commitment by his custodian to a state institution for treatment requires procedures appropriate to a "medical fact–finding process" rather than a "formal or quasi–formal hearing"). In this case the state has not proposed to punish the respondent because of her alleged illness. *See Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The respondent's interest may thus be distinguished from that of the criminally accused in the following respects: (1) the criminal suspect is accountable for his conduct in a punitive sense; (2) the effects of mental illness frequently create a social stigma, regardless of the outcome of a certification hearing; and (3) the patient's interest in her own safety or security is not completely divorced from the care and treatment she receives. *See Addington v. Texas, supra.* Her potential confinement would be for medical reasons, and it would not be for an indefinite period. Judicial review of short–term certification is available within ten days after written request is filed with the court by the respondent or her attorney.[18] The maximum period for an initial short–term certification is three months.[19] This period cannot be extended for more than another three months.[20] Long–term commitment cannot exceed six months,[21] except for any extensions which cannot themselves be for more than six months each.[22] Judicial review is available at all stages of this process.

The Colorado legislature intended that the civil commitment procedures set down in article 10 of title 27, C.R.S.1973, "provide the fullest possible measure of privacy, dignity, and other rights to persons undergoing care and treatment for mental illness." Section 27–10–101(1)(c), C.R.S.1973. The concern of the legislature, therefore, was to devise a system which protects those rights of the individual while, at the same time, creating a method to discover the truth of the patient's mental illness and whether this illness causes the individual to be a danger to others, or himself, or gravely disabled. Without some means of evaluating a person's mental condition, the central purpose of the statute would be defeated. *See Suzuki v. [Alba] Yuen*, 617 F.2d 173 (9th Cir. 1980).

The procedure that the Colorado legislature adopted to solve this problem provides that "[a]ll information obtained and records prepared in the course of providing any services under [article 10 of title 27, C.R.S.1973] to individuals under any provision of [article 10 of title 27, C.R.S.1973] shall be confidential and privileged matter." Section 27–10–120(1), C.R.S.1973. The information and records produced as evidence at a hearing conducted pursuant to section 27–10–111, C.R.S.1973 (1979 Supp.), are made unavailable for other use in the courts except "as necessary to the administration of the provisions of [article 10 of title 27, C.R.S.1973]." Therefore, except in appeals such as this, no information produced at a hearing on short–term certification, unless available to the People from other sources, can be used to incriminate the respondent in future criminal proceedings. In other words, she runs no appreciable risk that anything she says or does not say may be used against her in a criminal action. Whatever pressure she might feel, either to speak out or to remain silent, could not in a constitutional sense serve to compel her to *incriminate* herself. *See Baxter v. Palmigiano, supra.* Nor does this case involve the use of any sanctions to compel testimony that could be used against the respondent

**18.** Section 27–10–107(6), C.R.S.1973 (1979 Supp.).

**19.** Section 27–10–107(1), C.R.S.1973.

**20.** Section 27–10–108, C.R.S.1973.

**21.** Section 27–10–109(4), C.R.S.1973 (1979 Supp.).

**22.** Section 27–10–109(5), C.R.S.1973 (1979 Supp.).

during a certification hearing. *See Lefkowitz v. Cunningham, supra.*

■ Because of the limited use which can be made of respondent's statements or testimony at a certification hearing, we hold that due process does not require that the Fifth Amendment privilege against self-incrimination be extended to Colorado's civil commitment proceedings to bar the respondent from being called upon to testify or to justify her absence from court during the certification proceedings.

### B.

■ The People misapprehend the nature of the relationship between the respondent and Dr. Leopoldt. This is not a case where the court ordered an evaluation of the respondent's mental condition.[23] Nor did the treating psychiatrist seek short-term certification for the respondent following an emergency.[24] Instead, the respondent sought voluntary treatment; and her psychiatrist petitioned alleging that she would not remain remain in a voluntary treatment program.[25] We hold that under these circumstances the respondent is entitled to assert her statutory physician-patient privilege if Dr. Leopoldt is called upon as a witness to testify about any information he acquired in attending the respondent which was necessary for him to prescribe or act for her during the period of her voluntary treatment.[26]

The Colorado legislature has provided in section 27–10–103(1), C.R.S.1973:

> "Nothing in [article 10 of title 27] shall be construed in any way as limiting the right of any person to make voluntary application at any time to any public or private agency or professional person for mental health services, either by direct application in person or by referral from any other public or private agency or professional person."

The traditional rationale for the physician–patient privilege has been its role in placing "a patient in a position in which he or she would be more inclined to make a full disclosure to the doctor and to prevent the patient from being humiliated and embarrassed by disclosure of information about the patient by his or her doctor." *Community Hospital Association v. District Court*, 194 Colo. 98, 100, 570 P.2d 243, 244 (1977). The privilege functions as an encouragement and a protection for the person who seeks treatment.

■ The civil commitment statutes must be liberally construed to promote the legislative purpose of encouraging the "use of voluntary rather than coercive measures to secure the treatment and care for mental illness." Section 27–10–101(1)(d), C.R.S. 1973; *Sisneros v. District Court, supra; Goedecke v. State Department of Institutions, supra.* At the same time, the statutes are to be strictly construed to see that no limit is placed on a person's right to seek voluntary treatment. Section 27–10–103(1), C.R.S.1973. This being the case, the usual rule does not apply that testimonial exclusionary rules and privileges are to be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominate principle of utilizing all rational means for ascertaining truth." *Trammel v. United States*, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980), quoting *Elkins v. United States*, 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting).

There is no language in the statutes which expresses any intention that the physician–patient privilege not apply in cases such as this.[27] On the contrary, the stat-

---

**23.** *See* section 27–10 106, C.R.S.1973 (1979 Supp.).

**24.** *See* section 27–10–105, C.R.S.1973 (1979 Supp.).

**25.** *See* section 27–10–107(1)(b), C.R.S.1973.

**26.** *See* section 13 90 107(1)(d), C.R.S.1973 (1979 Supp.).

**27.** Such an exception to the physician-patient privilege is a feature of some modern statutory schemes. *See, e. g.*, Unif.R.Evid. (1974 Rev.) 503(d)(1); *see also* F.R.E., Proposed Rule 504(d)(1), rejected by the United States Congress.

utes are quite specific in stating the limited circumstances where the privilege does not apply. *See* section 13–90–107(1)(d), C.R.S. 1973 (1979 Supp.). Therefore, we conclude that the physician–patient privilege may be asserted by the respondent if Dr. Leopoldt is called upon to testify.

## VI.

 It appears that the principal determinations to be made by the court or jury will be findings of fact relating to whether the respondent is mentally ill and whether, if she is found to be mentally ill, this condition causes her to be gravely disabled because of an inability to take care of her basic personal needs. Accordingly, the district court should decide as a preliminary matter whether it is appropriate to order an evaluation of the respondent's present mental condition. *See* section 27–10–106, C.R.S. 1973.

The judgment of the district court is affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion.