LeRoy WILLIAMS, Jr., Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 82SC156.

Supreme Court of Colorado,
En Banc.

Aug. 27, 1984.
Rehearing Denied Sept. 17, 1984.

Frye & Sawaya, P.C., John R. Frye, Jr., Richard F. Rose, Denver, for petitioner.

J.D. McFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Valerie McNevin-Petersen, Nathan B. Coats, Asst. Attys. Gen., Denver, for respondent.

ERICKSON, Chief Justice.

We granted certiorari to review the Court of Appeals' unpublished opinion, which affirmed LeRoy Williams' (petitioner) conviction for aggravated robbery, section 18–4–302, 8 C.R.S. (1978). The petitioner contends that the district court erred in failing to suppress incriminating statements made in the course of psychotherapeutic treatment. He also requests that we review the statutory definition of a "deadly weapon" set forth in section 18–1–901(3)(e), 8 C.R.S. (1973). We affirm.

## I.

On March 1, 1980, petitioner robbed a Greeley supermarket at gunpoint. He claims that the gun was not loaded at the time of the robbery.[1] He left Colorado immediately after the robbery and eventually went to London, Ontario in Canada, where he attempted to take his own life.

As a result of his suicide attempt, he was admitted to the psychiatric ward of Victoria Hospital in London on April 14, 1980, and was placed under the care of Dr. William Keil, a staff psychiatrist. During his initial interview with Dr. Keil, the petitioner admitted his involvement in the Greeley robbery. Dr. Keil later spoke to an officer in the Greeley Police Department and was told that an arrest warrant was issued for the petitioner based upon the Greeley robbery.

On the morning of April 17, 1980, Dr. Keil contacted the London Police Department to ascertain his obligation to notify Canadian authorities of petitioner's presence at the hospital.[2] Dr. Keil spoke with Detective Schell, who indicated that he was uncertain regarding the application of Canadian law to an American citizen for whom a warrant is outstanding in the United States. Detective Schell investigated the matter that same morning, and learned that the petitioner was free to remain in Canada for up to three months. Later that day Detective Schell went to the hospital, where he informed Dr. Keil of the results of his investigation and offered his assistance.[3] Dr. Keil indicated at that time that

---

**1.** During direct examination, petitioner gave the following testimony:

Q. "Now, when you took the gun that night out of your girlfriend's closet, did you check it before leaving the house?"
A. "Yes. Well, the clip was pulled and it was laying beside the gun, and I put it in the gun. It was empty."
Q. "Did you check it to be sure it was empty?"
A. "Yes. Well, it's kept in the house empty. We never loaded it."
Q. "Was it empty that night?"
A. "Yes."
Q. "Did you see the box of ammunition by the gun?"
A. "Yes."
Q. "Did you take any of that ammunition and put it in the clip and put it in the gun?"
A. "No."

**2.** During the second suppression hearing held immediately prior to the beginning of the trial, Dr. Keil testified as follows:

Q. "Would you indicate to the Court how you came to contact Detective Schell?"

A. "I was in a rather difficult position ... I was dealing with an American citizen in an Ontario hospital who had stated he had committed a crime at that point.... I would have had the obligation, had he been a Canadian citizen, to notify the law in light of the nature of the alleged offense."
Q. "Okay, and for what purpose did you contact Detective Schell?"
A. "I didn't know whether the Ontario law would apply to him...."

**3.** During the second suppression hearing, Dr. Keil testified as follows:

A. "When Detective Schell came to the office, I met him first .... His first comment was that Leroy would be entitled to remain in Ontario for three months.... [He] had also contacted the immigration department, ... and he told me the only way immigration would become involved is if they had reason to believe that an American citizen was in an Ontario hospital without sufficient funds to pay their way.... He was obviously very sensitive to the problem and asked if he could assist in any way...."

Detective Schell was free to speak with the petitioner,[4] but did not tell him that the conversation would be part of petitioner's psychotherapy. Schell did not tell the petitioner that any statements he might make during the conversation would be kept confidential.[5]

Dr. Keil introduced the petitioner to Detective Schell, and then left the room. In the subsequent conversation, petitioner told Schell of his involvement in the robbery. Later that same day, Schell contacted the Greeley Police Department and informed them that the petitioner was present in London. Williams was arrested by Greeley police officers on April 21, 1980 after he returned to Greeley.

At the suppression hearing, petitioner sought to suppress the statements he made to Detective Schell while at Victoria Hospital, claiming that the information constituted privileged communications under sections 13–90–107(1)(d) & (g), 6 C.R.S. (1973). The district court denied the motion, finding that the statements in question were not privileged.

Williams renewed his motion to suppress at trial and made a motion for a judgment of acquittal, asserting that there was no evidence of the use of a deadly weapon as required by the aggravated robbery statute.[6] He alleged that the gun was not loaded during the robbery, and no evidence was introduced to prove that it was loaded at that time. The court denied both motions. The petitioner later testified on his own behalf, and admitted that he had robbed the store and that he had used a gun to coerce the store's employees into surrendering the money.[7] The jury found Williams guilty of aggravated robbery.

On appeal to the Court of Appeals, the petitioner originally presented only the privilege issues for consideration, believing

---

4. During the first suppression hearing, held August 18, 1980, Detective Schell testified as follows:

Q. "Why did Dr. Keil want you to speak to Mr. Williams?"
A. "He didn't say he wanted me to. He indicated that I was free to, if I wished to. . . ."

5. During the second suppression hearing, Dr. Keil testified as follows on cross-examination:

Q. "Dr. Keil, it seems to me that you said that you couldn't, you didn't know if Detective Schell promised to keep all disclosures made to him confidential. You don't know that, do you?"
A. "No."
Q. "He never made that promise to you, did he?"
A. "Basically, I don't recall him, no, I didn't ask him to make that promise, no."

6. Section 18–4–302, 8 C.R.S. (1978), provides:

**Aggravated Robbery.** (1) A person who commits robbery is guilty of aggravated robbery if during the act of robbery or immediate flight therefrom:

(a) He is armed with a deadly weapon with intent, if resisted, to kill, maim, or wound the person robbed or any other person; or

(b) He knowingly wounds or strikes the person robbed or any other person with a deadly weapon or by the use of force, threats, or intimidation with a deadly weapon knowingly puts the person robbed or any other person in reasonable fear of death or bodily injury; or

(c) He has present a confederate, aiding or abetting the perpetration of the robbery, armed with a deadly weapon, with the intent, either on the part of the defendant or confederate, if resistance is offered, to kill, maim, or wound the person robbed or any other person, or by the use of force, threats, or intimidation puts the person robbed or any other person in reasonable fear of death or bodily injury.

(2) Possession of any article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (1) of this section that he was so armed.

(3) Aggravated robbery is a class 3 felony.

7. At trial, the petitioner gave the following testimony on cross-examination:

Q. "So you went in to that store with your plan to rob it at gun point, right?"
A. "Right."
Q. "And you did take a lot of money there, didn't you?"
A. "Yes."
Q. "[I]n the course of your taking it, you pointed that gun at several people, didn't you?"
A. "Yes."
Q. "Why did you bring the gun along?"
A. "Because I didn't think they would give it to me if I didn't have it."
Q. "You used that to intimidate the people into giving you the money, didn't you?"
A. "Yes."

that the issue of whether an unloaded firearm constitutes a "deadly weapon" was moot under *People v. McPherson*, 200 Colo. 429, 619 P.2d 38 (1980) (unloaded firearm is a deadly weapon as a matter of law). During the pendency of the appeal, however, the Colorado General Assembly enacted section 2–4–214, 1B C.R.S. (1983 Supp.), which explicitly rejected the rule of statutory construction adopted in *McPherson.* The petitioner filed a motion for leave to supplement his opening brief on grounds that the result in *McPherson* should be reassessed in the light of section 2–4–214. The Court of Appeals denied the motion and affirmed the trial court's judgment.

## II.

■ Section 13–90–107(1)(d), 6 C.R.S. (1973), provides:

A physician ... duly authorized to practice his profession under the laws of this state, or any other state shall not be examined without the consent of his patient as to any information acquired in attending the patient which was *necessary to enable him to prescribe or act for the patient ....*

(Emphasis added.) The physician-patient privilege is statutorily created and must, therefore, be strictly construed. *See Community Hospital Association v. District Court*, 194 Colo. 98, 100, 570 P.2d 243, 244 (1977). The burden of establishing the applicability of the privilege rests with the claimant of the privilege. *Clark v. District Court, Second Judicial District*, 668 P.2d 3, 8 (Colo.1983); *see also Nelson v. Grissom*, 152 Colo. 502, 505, 382 P.2d 991, 993 (1963). A psychiatrist is treated as a physician under the statute. *People v. Taylor*, 618 P.2d 1127, 1140 (Colo.1980).

■ The physician-patient privilege was adopted to encourage a patient to make full disclosure to a doctor to enhance the effective diagnosis and treatment of illness. The statute also protects patients from the embarrassment and humiliation that might result from the physician's disclosure of information about the patient.

*E.g., Clark*, 668 P.2d at 8; *People v. Taylor*, 618 P.2d at 1140. In determining the applicability of the privilege, the trial court must ascertain whether information disclosed by the patient is necessary for treatment by the physician. *People v. Reynolds*, 195 Colo. 386, 389, 578 P.2d 647, 649 (1978).

■ We agree with the trial court's finding that the petitioner's conversation with Detective Schell at the hospital was not necessary to enable the physician to prescribe or act for the patient, and therefore did not fall within the physician-patient privilege. There is no evidence that Detective Schell was qualified to provide psychiatric therapy or any other type of treatment to the petitioner. The detective did not obtain any information which would have been otherwise unavailable to Dr. Keil for use in the petitioner's treatment.[8]

## III.

■ Petitioner claims that his statements to Detective Schell are protected by the statutory psychologist-patient privilege. § 13–90–107(1)(g), 6 C.R.S. (1973). We start with the assumption, for the purpose of this discussion, that as a psychiatrist, Dr. Keil was permitted by statute to provide psychological therapy. While conceding that neither Schell nor Keil is a psychologist, the petitioner contends that the privilege is still applicable based on the following statutory language:

[N]or shall any person who has participated in any psychological therapy, conducted under the supervision of a person authorized by law to conduct such therapy, including but not limited to group therapy sessions, be examined concerning any knowledge gained during the course of such therapy without the consent of the person to whom the testimony sought relates.

§ 13–90–107(1)(g), 6 C.R.S. (1973). Petitioner asserts that his conversation with Detective Schell was part of the psychologi-

8. *See supra* note 2.

cal therapy prescribed for him by Dr. Keil, and should be protected from disclosure by the statute. The district court found that petitioner's statements to Detective Schell did not constitute "psychological therapy" and were, therefore, not protected by the privilege statute.

The question of what constitutes psychological therapy within the meaning of section 13–90–107(1)(g) has not been previously addressed by this Court. However, we find the reasoning of other jurisdictions which have addressed this question in light of their own common law and statutory privileges to be persuasive. In *Allred v. State*, 554 P.2d 411, 418–19 (Alaska 1976), the Alaska Supreme Court distinguished psychological therapy from the fields of counseling and psychiatric social work, and held that a common law psychologist-patient privilege applies only to statements that are part of psychological therapy. The Utah Supreme Court, interpreting a statute very similar to the Colorado psychologist-patient privilege statute, has held that the protection of a psychologist-patient privilege statute "should not be extended to persons merely acting as agents for or under the direction of licensed psychologists." *State v. Gotfrey*, 598 P.2d 1325, 1328 (Utah 1979). Similarly, a social worker-client privilege has not been extended by the Louisiana Supreme Court to a counselor in a drug addiction treatment program even though she was "in the same position" as a social worker. *State v. Lassai*, 366 So.2d 1389, 1391 (La.1978).

The trial court's finding that the conversation between petitioner and Detective Schell did not constitute "psychological therapy" within the meaning of section 13–90–107(1)(g) is clearly supported by the record. There is no evidence that Detective Schell was qualified to provide any type of psychological therapy. Furthermore, Dr. Keil gave no indication to Schell that his visit would in any way be part of the petitioner's therapy and Schell's conversation with the petitioner did not in fact contribute to his psychological treatment. Neither Keil nor Schell said anything to the petitioner that would have given him reason to believe that his conversation with Schell was for a psychological therapeutic purpose. We hold, accordingly, that the trial court correctly found that the psychologist-patient privilege does not apply to the statements made by the petitioner to Detective Schell.

## IV.

■ Petitioner argues that the General Assembly's adoption of section 2–4–214, 1B C.R.S. (1983 Supp.)[9] in 1981 requires this court to reevaluate *People v. McPherson*, 200 Colo. 429, 619 P.2d 38 (1980), in which we held that an unloaded gun is a deadly weapon.

The General Assembly, in adopting section 2–4–214, expressly rejected the rule of statutory construction utilized by this court in *McPherson*. Later that year, however, an amendment to section 18–1–901(3)(e), 8 C.R.S. (1978 & 1983 Supp.)[10] clarified the

**9.** Section 2–4–214, 1B C.R.S. (1983) provides:

**Use of relative and qualifying words and phrases.** The general assembly hereby finds and declares that the rule of statutory construction expressed in the Colorado supreme court decision entitled *People v. McPherson*, 200 Colo. 429, 619 P.2d 38 (1980), which holds that "... relative and qualifying words and phrases, where no contrary intention appears, are construed to refer solely to the last antecedent with which they are closely connected ..." has not been adopted by the general assembly and does not create any presumption of statutory intent.

**10.** Prior to amendment, the statute read as follows:

**18–1–901. Definitions.**

. . . .

(3)(e) "Deadly weapon" means any firearm, knife, bludgeon, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or intended to be used is capable of producing death or serious bodily injury.

The amendment adopted in 1981 is post-operative and is presumed to be prospectively construed. Section 2–4–302, 1B C.R.S. (1983 Supp.). The amendment provides:

**18–1–901. Definitions.** (3)(e) "Deadly weapon" means any of the following which in the manner it is used or intended to be used is capable of producing death or serious bodily injury:

language defining "deadly weapon." In our view, the amendment does not affect our interpretation of section 18–1–901(3)(e) in *McPherson,* that an unloaded firearm is, as a matter of law, a deadly weapon under the felony menacing statute.

The judgment is affirmed.

(I) A firearm, whether loaded or unloaded;
(II) A knife;
(III) A bludgeon; or
(IV) Any other weapon, device, material, or substance, whether animate or inanimate.

Ch. 212, sec. 2, § 18–1–901(3)(e), 1981 Sess. Laws 972.