25CA0619 Peo in Interest of GH 06-05-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0619
City and County of Denver Probate Court No. 25MH2011
Honorable Beth A. Tomerlin, Magistrate

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of G.H.,

Respondent-Appellant.

---

ORDER AFFIRMED

Division I
Opinion by JUDGE KUHN
Moultrie and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 5, 2025

---

Katie McLoughlin, Acting City Attorney, Daniel B. Horwitz, Assistant City Attorney, Denver, Colorado, for Petitioner-Appellee

Richard Slosman, Boulder, Colorado, for Respondent-Appellant

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Respondent, G.H., appeals a magistrate's order committing him to the custody of the Colorado Department of Human Services, Behavioral Health Administration (BHA), under section 27-81-112, C.R.S. 2024.  We affirm.

## I.    Background

¶ 2    On February 20, 2025, Officer Alexa Jekich, a co-responder officer[1] with the Thornton Police Department, filed an application for emergency commitment under section 27-81-111, C.R.S. 2024, after responding to G.H.'s house on numerous occasions to provide resources for mental health and substance use treatment.  In the application, Officer Jekich alleged that for the past three months G.H. had presented with erratic and dangerous behavior, including wandering the streets and being hit by cars, setting fires to objects multiple times, and engaging in physical altercations due to agitation.  Officer Jekich further alleged that G.H. had recently tested positive for fentanyl, cannabis, and methamphetamine, was

---

[1] Officer Jekich explained at a hearing that she was assigned to a co-response unit in which an officer and a master's level clinician respond to mental health and substance abuse calls in an attempt to get people mental health or substance use treatment where appropriate.

not eating or sleeping well, and had refused voluntary substance use treatment. Based on the application for emergency commitment, G.H. was placed at Denver Community Addiction Rehabilitation and Evaluation Services (CARES) under the care and treatment of Dr. Daniel Severn, among others.

¶ 3 On March 3, 2025, the People petitioned a magistrate under section 27-81-112 to authorize involuntary commitment of G.H. to the custody of the BHA to receive substance use treatment. The People included with their petition a physician's certificate for involuntary commitment, completed by Dr. Severn, as well as an application for involuntary commitment, completed by Officer Jekich. The magistrate appointed counsel for G.H. and set the matter for an evidentiary hearing. Before the hearing, Kristina Coker, Licensed Clinical Social Worker and Involuntary Commitment Program Manager with the BHA, submitted a Recommendation for Placement, outlining various placement options for G.H.

¶ 4 At the evidentiary hearing Dr. Severn, Officer Jekich, Coker, and G.H. each testified. Dr. Severn was admitted as an expert in the field of psychiatry and addiction medication without objection.

He summarized G.H.'s "long history" of substance use and explained how G.H. met the diagnostic criteria for substance use disorder. Officer Jekich described her various contacts with G.H. spanning from January through February and how she and her clinician co-responder initially suspected mental health-related concerns but subsequently became concerned with possible substance use. Coker explained that G.H. had been administered the American Society of Addiction Medicine (ASAM) Criteria assessment. She then explained his results and the placement recommendations based on that assessment. G.H., for the most part, denied having any substance use problems and did not believe he needed inpatient treatment. He testified that he had "struggled with stuff in the past" but "besides alcohol and marijuana" had been "pretty sober" for the past three years.

¶ 5    The magistrate granted the petition, finding that the testimony provided by Dr. Severn, Officer Jekich, and Coker was "essentially uncontroverted" and "credible" and G.H.'s testimony, to the extent it disagreed with or was contradicted by these witnesses, was not credible. The magistrate found by clear and convincing evidence that G.H. is a person with a substance use disorder who is

3

incapacitated by substances, is a threat to himself and others, and has refused voluntary treatment. Accordingly, the magistrate ordered G.H. involuntarily committed to the custody of the BHA for ninety days of substance use treatment.

## II. Analysis

¶ 6 G.H. challenges the sufficiency of the evidence supporting the order. In particular, he contends the evidence was insufficient to support the magistrate's findings that he (1) has a substance use disorder; (2) has inflicted or is likely, unless committed, to inflict physical harm on himself or others; and (3) is incapacitated by substances. We address each contention in turn.

### A. Standard of Review and Applicable Law

¶ 7 When a party challenges the sufficiency of the evidence, we review the record de novo as a whole and, viewing it in the light most favorable to the People, determine whether the evidence is sufficient to support the court's decision. *People in Interest of Ramsey*, 2023 COA 95, ¶ 23. Likewise, we review de novo the court's conclusions of law, and we defer to its findings of fact, including the weight and credibility afforded to the witnesses, if supported by the record. *People in Interest of Strodtman*, 293 P.3d

123, 131 (Colo. App. 2011); *People in Interest of C.A.K.*, 652 P.2d 603, 613 (Colo. 1982). "The district court, as fact finder, 'has discretion to determine the credibility of the witnesses; the sufficiency, probative effect, and weight of the evidence; and the inferences and conclusions to be drawn from it.'" *People in Interest of R.C.*, 2019 COA 99M, ¶ 7 (quoting *People in Interest of S.M.A.M.A.*, 172 P.3d 958, 962 (Colo. App. 2007)).

¶ 8     Section 27-81-112(1) provides, in pertinent part, that a court may commit a person to the custody of the BHA if

> the person has a substance use disorder and that the person has threatened or attempted to inflict or inflicted physical harm on the person's self or on another and that unless committed, the person is likely to inflict physical harm on the person's self or on another or that the person is incapacitated by substances.

¶ 9     Before entering a commitment order, the court must find that grounds for involuntary commitment have been established by clear and convincing evidence. § 27-81-112(5). Evidence is clear and convincing when it "persuades the trier of fact that the truth of the contention is 'highly probable.'" *People v. Taylor,* 618 P.2d 1127,

1136 (Colo. 1980) (quoting *Page v. Clark*, 592 P.2d 792, 800 (Colo. 1979)).

## B. Substance Use Disorder

¶ 10 G.H. challenges the magistrate's finding that he has a substance use disorder. As relevant here, a "substance use disorder" means

> a chronic relapsing brain disease, characterized by recurrent use of alcohol, drugs, or both, causing clinically significant impairment, including health problems, disability, and failure to meet major responsibilities at work, school, or home.

§ 27-81-102(13.8), C.R.S. 2024.

¶ 11 The magistrate found that G.H. has a substance use disorder based on Dr. Severn's testimony that he has a "long history of alcohol use disorder, methamphetamine and cannabis and fentanyl use, as well as other prescription medications that goes back approximately [ten] years" and such use "has resulted in an inability to care for himself." Additionally, the magistrate noted that due to G.H.'s "erratic behavior" there had been "repeated calls to law enforcement" and an inability to manage his financial resources. The record supports these findings.

¶ 12    At the hearing Dr. Severn testified that in his opinion G.H. met the criteria for a substance use disorder as defined by the Diagnostic and Statistical Manual of Mental Disorders Version 5 Revised (DSM-5-TR) and as defined under Colorado Law. Specifically, he testified that G.H. has a chronic, relapsing brain disease that causes clinically significant impairment. Regarding evidence of G.H.'s clinically significant impairment, Dr. Severn testified that G.H. repeatedly uses substances and there had been thirty-five police calls for erratic behavior — including medical complaints, complaints from neighbors, an altercation in a bank, and threats toward police — as well as a failure to pay his bills.

¶ 13    Dr. Severn explained that based on his review of G.H.'s records combined with other information from law enforcement, as well as firsthand observations, G.H. has a history spanning "at least ten years" of "alcohol use disorder, methamphetamine use, cannabis use, and fentanyl use, in addition to other prescription medications." Dr. Severn testified that when G.H. arrived at Denver CARES, he tested positive for "cannabis and amphetamines." During Dr. Severn's clinical evaluation, G.H. presented "as a little disorganized . . . agitated, [and] upset," and had "some difficulty

7

with making some logical sense in terms of what had happened." He testified that G.H. was also unable to make plans for his future — namely, what he "planned to do once he got out of Denver CARES."

¶ 14 Despite this testimony, G.H. asserts that the record "does not support [a finding] that he meets the criteria for a substance use disorder" and instead his "mental health disorders . . . are sufficient to explain [his] behaviors." But Dr. Severn was asked whether there were any other explanations for the behavior he described or that he had seen in G.H.'s records and he testified that there was not. Dr. Severn explained that the change he observed in G.H.'s behavior after "a week or two" was "indicative of a washout period where his body [was] now starting to return . . . to more of a normal state." Dr. Severn further opined that while G.H. was being treated for some mental health issues, "such as depression and anxiety," the behavior that occurred while at the facility and just before his admission would not have been explained by those disorders and was "more indicative of a substance use issue."

¶ 15 Crediting Dr. Severn's testimony and explicitly adopting his opinions, the magistrate found that "there is nothing else that

would explain the before and after behavior that [Dr. Severn] witnessed" beyond "a washout period," which is "medically . . . more indicative of a substance use disorder." Because the record supports the magistrate's determination, we will not disturb it and, to the extent G.H. asks us to second-guess witness credibility or draw different inferences from the testimony, we decline to do so. *See R.C.,* ¶ 7.

### C.     Physical Harm to Self or Others

¶ 16     Next, G.H. asserts that there is not sufficient evidence in the record to establish that he has inflicted and is likely, unless committed, to inflict physical harm on himself or others. In particular, G.H. asserts that "[t]here was not much in the way of establishing that he has ever done harm to himself or to others, or that any of the incidents involving purported harm are attributable to substance abuse." We disagree.

¶ 17     As an initial matter, the People assert that the magistrate only had to find either that the person is at risk of physical harm to self or others *or* that they are incapacitated by substances. *See* § 27-81-112(1). We agree that one of these findings is sufficient. In this case, however, the magistrate addressed both of these prongs.

¶ 18    As relevant to this contention, the magistrate found, with record support, that G.H., "due to his substance use disorder, has threatened or attempted to inflict or inflicted harm onto himself or another" and "[u]nless committed, [he] is likely to inflict physical harm on himself or others."  In support of its finding, the magistrate noted that G.H. had engaged in "disruptive behaviors and threatening type behaviors that were concerning enough to require a response from police and law enforcement."

¶ 19    Beyond the thirty-five calls for service to his residence for various well-being checks, medical concerns, and complaints from neighbors, Officer Jekich testified that she responded to G.H.'s house at least four separate times based on concerns regarding G.H.'s safety "to himself or others."  While the first two times were based primarily on noise complaints from the neighbors, the third time Officer Jekich learned that G.H. "was lighting a chair on fire" and had made comments about "lighting his house on fire for insurance purposes."  Based on this, Officer Jekich and her co-response team clinician partner decided to put G.H. on a mental health hold.  But G.H. was discharged from the mental health hold after testing positive for amphetamines and marijuana.  When he

was again hospitalized and tested positive for those substances, Officer Jekich decided an emergency commitment was the next appropriate step.

¶ 20     In addition to lighting fires, G.H. told Officer Jekich that he had been "hit by a television while walking around" and had been "hit by multiple vehicles."  G.H. himself confirmed that he was lighting fires in his driveway, was struck by a car and broke "several of [his] ribs," was hit by a television when it "bounced out of the back" of a truck, and "got in[to] several fights with [police] officers." Officer Jekich testified that they "were concerned for [G.H.'s] safety in regards to being left to his own devices" and she "suspected drug use" on "pretty much . . . every encounter that [they] had."

¶ 21     Accordingly, because the record supports the magistrate's findings, we discern no error in the finding that G.H., due to his substance use disorder, has inflicted and is likely, unless committed, to inflict physical harm on himself or others.

### D.     Incapacitated by Substances

¶ 22     Finally, we address G.H.'s contention that the evidence presented at the hearing was insufficient to establish that he is incapacitated by substances.  As relevant here, "incapacitated by

11

substances" means that a person, because of their use of drugs or alcohol:

> is unconscious or has judgment otherwise so impaired that the person is incapable of realizing and making a rational decision with respect to the person's need for treatment, is unable to take care of basic personal needs or safety, or lacks sufficient understanding or capacity to make or communicate rational decisions concerning himself or herself.

§ 27-81-102(9), (9.2), (9.4).

¶ 23 True, as G.H. points out, there is no evidence in the record that he has ever been rendered unconscious by substances. But the magistrate found that G.H.'s "judgment [is] otherwise so impaired that he is incapable of realizing and making rational decisions with respect to his need for treatment" and he is "unable to care for his basic personal needs and safety." These findings are adequately supported by the record.

¶ 24 Dr. Severn opined that G.H. is incapacitated by substances because "even though he's gone through a detox period," Dr. Severn expects that "psychologically he would revert back to his behavior and substance use after he is released, unless he goes into a treatment program." Dr. Severn also opined that G.H.'s judgment is

impaired and his "rational ability . . . is greatly influenced by his substance use."

¶ 25    Regarding his ability to make a rational decision with respect to his need for treatment, G.H. testified that he did not believe he needed inpatient treatment, and instead, he would, if necessary, continue outpatient treatment at Red Rocks Recovery. But Dr. Severn testified that he was concerned that even if G.H. was willing to "accept voluntary treatment" he was unlikely to follow through with it. And Coker testified that G.H. has "demonstrated an inability to follow through with voluntary treatment" and that his chosen outpatient facility, Red Rocks Recovery, would not be an appropriate placement for him given his ASAM assessment results.

¶ 26    Concerning G.H.'s ability to take care of his own basic personal needs or safety, it was Dr. Severn's opinion that G.H. "lack[s the] ability to care for himself and to meet his personal obligations." Officer Jekich described G.H.'s home as being in a state of "extreme disarray" and "very cluttered with new items." She described how there was red spray paint all over the sidewalk, above his garage, and around his windows, as well as "a lot of trash" in the front yard and driveway. Indeed, G.H. himself testified

13

that, despite receiving a $34,000 monthly inheritance stipend, his water was shut off at his house based on a failure to pay his water bill and he had to rely on his neighbors for meals, drinking water, and showers. He also described at times staying in hotels, homeless shelters, and sleeping on the streets.

¶ 27 This evidence, when viewed as a whole and in the light most favorable to the People, is more than sufficient to support the magistrate's finding that G.H. is incapacitated by substances.

### III.  Disposition

¶ 28 The order authorizing involuntary commitment pursuant to section 27-81-112 is affirmed.

JUDGE MOULTRIE and JUDGE BERGER concur.