No. 27957

**The People of the State of Colorado v. James Frederick Lane**

(581 P.2d 719)

Decided June 26, 1978.

James V. Phelps, Pueblo County Attorney, Paul J. Willumstad, Assistant, for petitioner-appellee.

James R. Hurst, for respondent-appellant.

Robin S. Freedman, for amicus curiae Colorado Bar Association Office for the Mentally Disabled.

*En Banc.*

MR. JUSTICE CARRIGAN delivered the opinion of the Court.

The appellant challenges the district court's order, entered pursuant to section 27-10-101, *et seq.,* C.R.S. 1973 (1976 Supp.), which determined that he is mentally ill, a danger to others, and in need of long-term care and treatment. We affirm the district court's order.

In 1955, when he was fourteen years old, the appellant was committed to the Colorado State Hospital. Except for isolated, brief periods, he has remained there since. On June 2, 1976, the hospital filed a petition pursuant to the Colorado Care and Treatment of the Mentally Ill Act,[1] for evaluation and screening of the appellant in order to obtain a new order for commitment. The court entered an order authorizing evaluation.

---

[1] *See* section 27-10-106, C.R.S. 1973 (1976 Supp.), and section 27-10-114, C.R.S. 1973 (1976 Supp.).

On June 4, 1976, the evaluating psychiatrist certified the appellant as mentally ill and a danger to himself or others. After an August 19, 1976, hearing on the certification, the district court accepted the psychiatrist's analysis and authorized short-term treatment pursuant to section 27-10-107, C.R.S. 1973 (1976 Supp.). The court determined, however, that the appellant's assignment to the hospital's Forensic Ward failed to accord him the required "least restrictive alternative"[2] mode of treatment, and thus ordered him transferred to the General Adult Psychiatric Services unit. Finally, the court ordered hospital personnel to develop a treatment program and deliver to it a copy so that it could monitor the appellant's status. His progress was scheduled for court review on November 5, 1976.

On September 2, 1976, Dr. Michael Guthrie extended the appellant's certification for short-term treatment for an additional ninety days,[3] to December 4, 1976. Prior to expiration of that ninety-day period, the doctor filed a petition for long-term care and treatment,[4] on which a hearing was held December 3, 1976.

At the latter hearing, the court found that the appellant still was mentally ill, a danger to others, and in need of long-term care and treatment. Although the petition had requested a six-month treatment period, the court limited the period to three months and ordered the hospital treatment team to report twice monthly on the appellant's progress. From this order the appellant has appealed.

Section 27-10-109, C.R.S. 1973 (1976 Supp.), sets out in detail the prerequisites for commitment for long-term care and treatment. Those portions pertinent to our decision on this appeal are as follows:

"*Long-term care and treatment of the mentally ill.* (1) Whenever a respondent has received short-term treatment for five consecutive months under the provisions of 27-10-107 and 27-10-108, the professional person in charge of the evaluation and treatment may file a petition with the court for long-term care and treatment of the respondent under the following conditions:

"(a) The professional staff of the agency or facility providing short-term treatment has analyzed the respondent's condition and has found that the respondent is mentally ill and, as a result of mental illness, a danger to others or to himself or gravely disabled.
* * * *

"(4) The court or jury shall determine whether the conditions of subsection (1) of this section are met and whether the respondent is mentally ill and, as a result, a danger to others or to himself or gravely disabled. The court shall thereupon issue an order of long-term care and treatment for a

---

[2] *See* section 27-10-101(1)(b), C.R.S. 1973.
[3] *See* section 27-10-108, C.R.S. 1973.
[4] *See* section 27-10-109, C.R.S. 1973.

term not to exceed six months, or it shall discharge the respondent for whom long-term care and treatment was sought, or it shall enter any other appropriate order. . . ."

In addition, section 27-10-111(1), C.R.S. 1973 (1976 Supp.), establishes hearing procedures and the burden of proof necessary to support long-term commitment, as follows:

"*Hearing procedures — jurisdiction.* (1) Hearings before the court under section 27-10-107, 27-10-108, or 27-10-109 shall be conducted in the same manner as other civil proceedings before such court. The burden of proof shall be upon the person or facility seeking to detain the respondent. The court or jury shall determine that the respondent is in need of care and treatment only if the court or jury finds such person mentally ill *and,* as a result of such mental illness, a danger to others *or* to himself *or* gravely disabled, by clear and convincing evidence." (Emphasis added.)

Thus, the statutes require that, before authorizing long-term commitment, the trial court find, not only that the respondent is "mentally ill," but also as a result of his illness that he is either: (1) a danger to others, (2) a danger to himself, or (3) gravely disabled. The person or institution seeking the commitment order has the burden of proving these facts by "clear and convincing evidence."

The questions here raised concern the quality of evidence required to meet the "clear and convincing evidence" standard for proof of danger to others. The appellant argues that judicial findings of dangerousness may not constitutionally be based solely on what he characterizes as "unsupported" psychiatric opinion — that is, psychiatric opinion not in turn based, at least in part, on "recent overt acts, attempts or threats" constituting dangerous behavior. This argument is premised on the contention that psychiatric predictions of dangerousness, when not based on *recent* overt behavior, have generally proven inaccurate,[5] and therefore are insufficiently reliable to meet the statutory standard of proof.

Civil commitment of the mentally ill has generally been justified on one of two premises: (1) that the state is acting as *parens patriae,* and thus is depriving the individual of liberty, not for punishment, but for treatment; or (2) that one whose mental illness renders him potentially dangerous may be deprived of liberty under the police power to protect society against him. *See Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D. Wis. 1972).

However, the state's power to confine persons on either basis must be carefully restrained by procedural safeguards, and can be invoked only by

---

[5] *See generally, e.g., Diamond, "The Psychiatric Prediction of Dangerousness,"* 123 *U.Pa.L.Rev.* 439 (1974); *Ennis & Litwack, "Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,"* 62 *Calif.L.Rev.* 693 (1974); *Kozol, Boucher & Garofalo, "The Diagnosis and Treatment of Dangerousness,"* 18 *Crime & Delinquency* 371 (1974).

conditions "great enough to justify such a massive curtailment of liberty." *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394, 402 (1972).

"A finding of 'mental illness' alone cannot justify a state's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom." *O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396, 406-07 (1975).

Because of the constitutional rights at stake, it is essential that the courts carefully scrutinize, in each case, the petitioning party's proof of mental illness and dangerousness or grave disability. In this case, however, the appellant not only seeks review of whether the proof presented met the statutory burden, but also asks that we hold, as a matter of law, that psychiatric opinion, not corroborated by evidence of *recent* dangerous conduct, can never constitute "clear and convincing evidence" of dangerousness, and therefore can never be sufficient to sustain a commitment based on dangerousness.

We need not, however, reach that issue here, for the record is replete with evidence that the psychiatrist's opinion predicting future dangerousness was in fact based on the appellant's recent behavior. Therefore, we need not decide at this time whether a commitment based on psychiatric opinion "unsupported" by recent conduct evincing danger to others would deny due process.

The dispositive question here presented is whether the proof constituted "clear and convincing evidence" of dangerousness. We hold that it did.

 "Clear and convincing evidence" has been defined as "that evidence which is stronger than a 'preponderance of the evidence,' and which is unmistakable and free from serious or substantial doubt." *Colo. J.I. (Civil)* 3:2. *See also Whatley v. Wood,* 157 Colo. 552, 404 P.2d 537 (1965); *Olinger Mutual Benefit Association v. Christy,* 139 Colo. 425, 342 P.2d 1000 (1959). Here the record supports the trial court's conclusion that the People met their burden of proof.

The People's only evidence at the hearing was the testimony of Dr. Guthrie, the appellant's treating psychiatrist at the Colorado State Hospital. Contrary to the appellant's assertions, however, Dr. Guthrie's opinion predicting future dangerous behavior was not mere "speculation" unsupported by any factual basis.

At the beginning of his testimony, for example, Dr. Guthrie related the appellant's psychiatric history. Mr. Lane was admitted to the Colorado State Hospital at Pueblo in 1955 and spent the ensuing twenty-

one years in various divisions being treated in a variety of detentions. In 1961 he escaped, planning to ask a nurse to have sexual intercourse with him and to assult her if she refused. He was picked up by the police and later was transferred to the penitentiary where he spent about six months before being returned to the State Hospital.

In 1965 the respondent was working at the Vail Hotel in Pueblo and riding back to the hospital each night with a female patient. He asked her for sexual favors and threatened her with a knife when she refused. She escaped and phoned the hospital police who returned the respondent to the hospital.

In 1967 it was discovered that Mr. Lane's diaries detailed escape plans and sexual fantasy material including rape and other violence against females. In 1970 he was given a conditional release to live at a Pueblo boarding house where he asked the operator for sexual favors. She refused and escaped. He was returned to the hospital's maximum security unit.

In 1971 the respondent was found to have diaries listing nurses' names and addresses together with his sexually-oriented, somewhat sadistic feelings about them.

In 1972 while studying in maximum security, the respondent arranged to have a female patient bring him food when he was alone in the school building. He threatened her with a screwdriver, bound her, gagged her, took off her clothes and attempted to rape her. When discovered, he threatened to take her hostage in order to escape. He was incarcerated at the penitentiary for a year and a half.

In 1973 Mr. Lane was returned to the State Hospital. In 1975 he was again found to have diaries expressing explicit sexual feelings and desires, primarily addressed to female staff members and containing lewd references, threatening remarks and fantasies of rape and abuse. He was kept in maximum security until the summer of 1976 when he was transferred to the general adult psychiatric division by court order.

Based on this history, his own observations, and evaluations by other hospital staff members, Dr. Guthrie concluded, in his 1976 opinion evidence, that the appellant was "clinically dangerous," and that in certain situations there was a substantial likelihood that, if released, he would be dangerous to others "in the immediate future." The doctor emphasized that on past occasions the appellant had been unable to cope with his problems and had committed harmful acts when permitted greater freedom. Predictions of future dangerousness were predicated on the fact that the appellant still retained many of the mental problems which had prompted his past actions.

It is important to reiterate that Dr. Guthrie's predictions of dangerousness were asserted at a hearing in which the hospital sought, not an extensive or indefinite extension of confinement, but an additional six

months' confinement in order to complete a treatment program designed to prepare the appellant for release. The specific question before the trial court, therefore, was whether there was "clear and convincing evidence" of dangerousness sufficient to justify continued confinement for a certain period for a limited purpose. Dr. Guthrie's uncontroverted testimony, buttressed by the appellant's prior history, clearly supported the trial court's affirmative answer to that question.

It should be noted that the trial court continued the commitment for a time shorter than requested, ordered semi-monthly court review of the appellant's treatment and progress, and approved a step-by-step approach to the appellant's release. Those actions demonstrate not only careful consideration by the court of the numerous factors involved and determination that the People be required to justify any continued confinement, but resolve to provide genuinely independent judicial scrutiny of the grounds for commitment. We perceive no error in the trial court's handling of the matter.

Accordingly the trial court's order is affirmed.

MR. JUSTICE HODGES does not participate.