Freddie B. DONALDSON, Petitioner,

v.

The DISTRICT COURT FOR the CITY AND COUNTY OF DENVER, and John W. Coughlin, one of the Judges thereof, Respondents.

No. 92SA371.

Supreme Court of Colorado,
En Banc.

Feb. 22, 1993.

David F. Vela, State Public Defender, Robin A. Carey, Deputy State Public Defender, Denver, for petitioner.

Norman S. Early, Jr., Dist. Atty., Second Judicial Dist., Nathan B. Coats, Chief Appellate Deputy Dist. Atty., Denver, for respondents.

Justice KIRSHBAUM delivered the Opinion of the Court.

In this original proceeding filed pursuant to C.A.R. 21, the petitioner, Freddie B. Donaldson, seeks an order prohibiting the respondent, the District Court in and for the City and County of Denver, from authorizing the administration of the antipsychotic drug prolixin[1] to the petitioner. Having issued a rule to show cause why the requested relief should not be granted, we now discharge the rule.

I

The petitioner is charged with offenses in two criminal proceedings, one pending in the District Court for Arapahoe County, Colorado, and the other pending in the respondent District Court for the City and County of Denver, Colorado. In March 1992, the trial court in the Arapahoe County District Court proceeding ordered the petitioner, *inter alia*, to undergo a competency examination at the Colorado Mental Health Institute at Pueblo, Colorado (the Institute).[2] Dr. Jerome Chadwick, one of

---

1. Prolixin is a trademark for preparations of fluphenazine hydrochloride, a crystalline powder used as a tranquilizer in the treatment of manifestations of mental disorders. *Dorland's Illustrated Medical Dictionary* 1363 (27th ed. 1988).

2. When addressing questions concerning the competency of a defendant to participate in criminal proceedings, a trial court must initially determine whether the defendant is competent to proceed. § 16–8–111(1), 8A C.R.S. (1986). The court may order a competency examination to assist that determination, pursuant to § 16–8–106(1), 8A C.R.S. (1986 & 1992 Supp.). If the

court ultimately determines that the defendant is incompetent to proceed, the court may commit the defendant to the custody of the Department of Institutions until the defendant has been restored to competency or has been confined for a period of time equal to the maximum term of confinement which would have been imposed upon the defendant for the charged offense. §§ 16–8–112(2), –114.5(1), 8A C.R.S. (1986 & 1992 Supp.). The Department of Institutions supervises and controls the Institute. § 24–1–118(3)(c), 10A C.R.S. (1988 & 1992 Supp.).

The Arapahoe County District Court also ordered a sanity examination pursuant to § 16–8–

the petitioner's treating staff psychiatrists, reported that in his opinion the petitioner suffered from chronic, paranoid schizophrenia which rendered him incapable of understanding the charges filed and incompetent to proceed, but that the petitioner could be restored to competency through appropriate treatment.

On July 29, 1992, the respondent trial court found the petitioner incompetent to proceed in this case and ordered the petitioner's commitment to the Institute for treatment. Medical personnel at the Institute determined that prolixin should be administered to the petitioner to prevent long-term deterioration. Although he initially refused to take the medication, the petitioner subsequently agreed to ingest two prolixin pills each day, one in the morning and one in the evening.[3]

On August 4, 1992, the petitioner ingested one pill. The following day he ingested two pills, as prescribed. On August 6, 1992, the petitioner refused to ingest the medication. That evening his right jaw became distorted, his tongue contracted, and he indicated he could not swallow. The drug cogentin[4] was administered to the petitioner to counteract this reaction. When the petitioner subsequently refused to ingest prolixin, a petition was filed with the trial court requesting an order authorizing the Institute's staff to administer controlled doses of prolixin to treat the petitioner.

The trial court conducted a hearing on the motion. The petitioner, who was present and was represented by counsel, did not offer any evidence on his behalf.[5] The prosecution elicited testimony by telephone from one witness, Dr. Howard W. Fisher, who was at the time the petitioner's treat-ing staff psychiatrist. Dr. Fisher stated that, based on hospital notes, information he received from staff who treated the petitioner on a daily basis, and his own observations of the petitioner, in his opinion the petitioner suffered from paranoid schizophrenia, had a history consistent with an antisocial personality disorder, and was a "very dangerous person." Dr. Fisher testified that while undergoing treatment at a California psychiatric hospital in connection with criminal charges in that state the petitioner had exhibited extreme and violent symptoms of paranoia and had received extraordinary high doses of the drug thorazine;[6] that the petitioner had previously attempted suicide and had experienced a paranoid breakdown while incarcerated in the Colorado Department of Corrections;[7] and that during his confinement at the Institute the petitioner had exhibited extreme anger and hostility, particularly when confronted about the reasons for his confinement.

Dr. Fisher further testified that fine movements of the tongue may indicate the onset of tardive dyskinesia; that muscle rigidity may suggest the onset of a potentially fatal disorder, neuroleptic malignant syndrome; and that both conditions are potential side effects of the use of prolixin. He stated that the petitioner's behavior was highly suspect because reactions to prolixin ordinarily occur soon after the medication is ingested. Dr. Fisher also testified that although the petitioner has not exhibited any assaultive behavior at the Institute, the petitioner continues to pose a threat to himself and others; that without prolixin the petitioner has made no progress; and that in his opinion it is necessary

---

106(1), 8A C.R.S. (1986 & 1992 Supp.). The petitioner's sanity is not at issue in this case.

3. The record does not indicate the amount of prolixin contained in the pills administered to the petitioner.

4. Cogentin is a trademark for preparations of benztropine mesylate, a powder having, *inter alia*, local anesthetic actions. *Dorland's Illustrated Medical Dictionary* 355 (27th ed. 1988).

5. The petitioner did make a brief statement to the trial court subsequent to the trial court's oral ruling.

6. Thorazine is a trademark for preparations of chlorpromazine hydrochloride, a powder used as a tranquilizer. *Dorland's Illustrated Medical Dictionary* 1716 (27th ed. 1988).

7. Dr. Fisher also noted that the petitioner provided little information about a head injury he had sustained and that the petitioner's attorney refused to release records to the Institute's staff.

to administer prolixin to treat the petitioner, that effective less intrusive treatment alternatives are not available, and that reduced dosages of prolixin would minimize the likelihood of adverse reactions.

At the conclusion of the hearing, the trial court found that the petitioner is argumentative and verbally abusive, that he does not follow staff instructions, and that the side effects of prolixin usually occur after high doses have been given during an extended period of time and occur mostly with elderly people. It concluded that the petitioner is incompetent to participate effectively in treatment decisions, that administration of prolixin is necessary to prevent a significant and likely deterioration in the petitioner's mental condition or to prevent the likelihood of the patient causing serious bodily injury to himself or others, that no less intrusive treatment alternatives are available for the petitioner's condition, and that the necessity for effective treatment is sufficiently compelling to override the legitimate interest of the petitioner. The trial court ordered that the petitioner be administered a lesser dose of prolixin than had been prescribed in August of 1992 and that a review hearing be conducted shortly thereafter at which Dr. Fisher would appear and testify with respect to the progress of the petitioner's treatment as well as any side effects that the petitioner might suffer.

## II

The petitioner argues that the trial court abused its discretion in ordering the administration of prolixin in the circumstances of this case. We disagree.

The well-established right of a patient involuntarily committed to a mental institution by means of civil adjudicatory proceedings to refuse administration of medication is grounded in constitutional principles, statutory standards and the common law of this state. Such commitment constitutes a severe infringement of the patient's interest in freedom from governmental restraint requiring protection under the Due Process Clauses of the United States and Colorado Constitutions. *People v. Medina,* 705 P.2d 961, 967 (Colo.1985). As the United States Supreme Court recently stated, the unconsensual treatment by antipsychotic drugs of a person detained for trial violates federal constitutional due process guarantees "absent a finding of overriding justification and a determination of medical appropriateness." *Riggins v. Nevada,* —— U.S. ——, ——, 112 S.Ct. 1810, 1815, 118 L.Ed.2d 479 (1992). The General Assembly has determined that a patient involuntarily committed for treatment by means of civil adjudication "shall not forfeit any legal right or suffer legal disability," § 27–10–104, 11B C.R.S. (1989), and that a person receiving mental health treatment is entitled to such treatment as will meet that person's needs. § 27–10–116(1)(a), 11B C.R.S. (1989).

In *Goedecke v. Department of Institutions,* 198 Colo. 407, 411, 603 P.2d 123, 125 (1979), this court held that a patient committed to a mental institution by means of civil adjudication has a qualified common-law right to decline treatment by antipsychotic medication. *See also Schloendorff v. Society of New York Hosp.,* 211 N.Y. 125, 105 N.E. 92, 93 (1914). In *Medina,* we reaffirmed this common-law right. 705 P.2d at 971. We also recognized, however, that treatment by antipsychotic medication could be forcibly administered to such patient if in an adversary proceeding the petitioning party establishes the following four factors by clear and convincing evidence: (1) the patient is incompetent to effectively participate in the treatment decision; (2) treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood that the patient will cause serious harm to the patient or to others in the institution; (3) a less intrusive treatment alternative is not available; and (4) the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment. *Id.* at 973. In *People v. Gilliland,* 769 P.2d 477, 483 (Colo.1989), we found the *Medina* criteria applicable in a proceeding to determine whether antipsychotic medication should be administered by Colorado

State Hospital staff for treatment of a non-consenting defendant involuntarily committed to the Department of Institutions in connection with criminal proceedings.

In this case, the petitioner does not argue that the trial court failed to apply the proper criteria, as articulated in *Medina*. The petitioner contends, however, that the trial court seriously abused its discretion in concluding that the four factors articulated in *Medina* were established by clear and convincing evidence. *Brewer v. District Court,* 655 P.2d 819, 820 (Colo.1982); *see Halaby, McCrea & Cross v. Hoffman,* 831 P.2d 902, 905 (Colo.1992). We reject this argument.

The trial court heard uncontradicted testimony from the petitioner's treating staff psychiatrist that the petitioner is incompetent to participate in treatment decisions and has disrupted efforts to provide other treatment alternatives; that in the absence of treatment by reduced doses of prolixin the petitioner will likely continue to constitute a significant danger to himself and others; and that no less intrusive effective means of treating the petitioner are available. The psychiatrist's testimony was neither objected to nor controverted by contrary evidence. In view of the record as a whole, the trial court did not abuse its discretion in concluding that the People had established the first three factors articulated in *Medina* by clear and convincing evidence. *See People v. Stevens,* 761 P.2d 768, 775 (Colo.1988); *People v. Lane,* 196 Colo. 42, 48, 581 P.2d 719, 723 (1978); *People v. Pflugbeil,* 834 P.2d 843, 847 (Colo. App.1992).

With respect to the fourth *Medina* factor, the petitioner emphasizes that because he suffered serious side effects from ingesting prolixin, the People failed to establish by clear and convincing evidence that his need for effective treatment was sufficiently compelling to override his legitimate interest in refusing treatment. We again disagree.

The trial court found, as Dr. Fisher testified, that the usual side effects of this particular drug most frequently occur soon after the medication is administered, but that the petitioner did not appear to suffer any side effects until some twenty-four hours after the last dosage was ingested. The trial court also found that during the first two days the drug was administered the petitioner did not suffer any side effects and that when the petitioner ultimately exhibited an apparent adverse reaction to the drug, that he was in "good shape" within fifteen to twenty minutes after an antidote was administered. Although Dr. Fisher suggested that the petitioner in fact may not have experienced a serious reaction to the medication, the trial court recognized the potentially serious side effects of use of the drug by ordering that a lower dose of prolixin be administered and requiring that a hearing be conducted soon after such treatment in order to evaluate the petitioner and his treatment.

In our view, the testimony as a whole establishes not only that administration of the drug prolixin is essential for the treatment of the petitioner, but also that the recommended diminished dosage sufficiently reduces the danger of significant adverse reactions to establish by clear and convincing evidence that the need for the drug, administered as ordered by the trial court, outweighs all legitimate interests the petitioner has in refusing such treatment. We therefore conclude that the trial court did not abuse its discretion in determining that the fourth *Medina* factor was satisfied in this case.

### III

For the foregoing reasons, the rule to show cause is discharged.

SCOTT, J., dissents, and LOHR, J., joins in the dissent.

Justice SCOTT dissenting:

I respectfully dissent and would make the rule absolute. The petitioner, after evaluation by mental health experts, was found to be incompetent to stand trial and was committed to the Colorado Mental Health Institute at Pueblo (Institute) on July 29, 1992. The majority holds that the record supports the district court's determi-

nation that the administration of antipsychotic medication to petitioner, Freddie B. Donaldson, a nonconsenting incompetent and mentally ill patient, was appropriate based upon a hearing and the standards set forth by this court in *People v. Medina,* 705 P.2d 961 (Colo.1985). The sole evidence before the trial court was the telephone testimony of Dr. Howard W. Fisher. Because the evidence in the record falls short of the "clear and convincing" standard required by *Medina,* I dissent.

## I.

In *People v. Medina,* this court held, unless there is an emergency, a court may authorize the involuntary administration of antipsychotic medication after a full and fair hearing on the treatment decision only if there exists "clear and convincing" evidence that: (1) the patient is incompetent to effectively participate in the treatment decision; (2) treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient causing serious harm to himself or others in the institution; (3) a less intrusive treatment alternative is not available; and (4) the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment. *Medina,* 705 P.2d at 963–64.

As the moving party, the burden of proving each of these elements by clear and convincing evidence is on the state. Whether Donaldson "offered any evidence on his behalf," maj. op. at 633, is of little significance. Unless the state proved each of the factors required under *Medina* by clear and convincing evidence, the district court abused its discretion by authorizing antipsychotic medication to be administered

involuntarily to Donaldson. In my view, the second, third, and fourth factors under *Medina* are not supported by clear and convincing evidence in the record.[1]

## A.

The second factor set out in *Medina* requires that before antipsychotic medication can be administered to a nonconsenting patient, the treatment must be necessary to prevent a "significant and likely long-term deterioration in the patient's mental condition."[2] 705 P.2d at 964. The third factor requires that there be no less intrusive treatment alternative available than the forced medication recommended.

To support its contention that these two factors are satisfied, the state presented the affidavit, psychiatric assessment report, and telephone testimony of Dr. Howard W. Fisher, a staff psychiatrist at the Colorado Mental Health Institute. Despite Fisher's statements in his affidavit and testimony that antipsychotic medication is necessary to prevent Donaldson's "significant and long term deterioration," Fisher testified otherwise on both direct and cross examination. On direct examination he explained his true purpose in the forced administration of medication was to restore Donaldson to competency so that he could stand trial on the pending criminal charges. On cross-examination, Fisher stated, "I just feel without offering medication to him, we're not going to get off the dime here, and he's not going to go forward. And he may just stay in an incompetent to proceed status." Thus, inconsistent with *Medina's* clear requirement that forced drug intervention be necessary to prevent deterioration in Donaldson's mental condition, the state is pursuing a treatment designed, as its "total goal," to restore Donaldson to competency.[3]

---

**1.** Since it is undisputed that Donaldson is not competent, the first element in *Medina* is not at issue.

**2.** Despite the majority's observation that Donaldson was very dangerous, maj. op. at 633, I will not address the alternative portion of the second *Medina* factor, i.e., whether it is likely the patient will harm himself or others if not

treated with antipsychotic medication, because the district court found Donaldson was not "assaultive" and "not [ ] physically violent to the staff or any other patient."

**3.** The state would have us enlarge our holding in *Medina* to permit the state's prosecutorial interest, in treating patients so they are competent to stand trial on pending criminal charges,

Fisher also testified that forced injection with antipsychotic medication is the least intrusive treatment available. However, after stating that antipsychotic drugs *should not be used if the patient does not suffer from a psychotic illness,*[4] Fisher expressed doubt regarding the nature of Donaldson's illness:

> Well, we don't know whether he's delusional or not. He told Dr. Chadwick a tremendous amount of delusional ideas but denied them all to us. It's typical for delusional people to be able to hide this. Usually, they look paranoid while they're doing it, but it's possible for antisocial people to also be paranoid and delusional and hide it. It is difficult to know what is really wrong with Mr. Donaldson at this point, but we are concerned that without treatment, he may simply stay in the state hospital and not progress to being competent.

Further adding to the unconvincing nature of the record before us is Fisher's Institute Psychiatric Assessment (IPA), a psychiatric evaluation of Donaldson prepared on July 31, 1992 (attached as Appendix C to Donaldson's petition). In his IPA, Fisher suggests several less restrictive alternative treatments "expected to improve [Donaldson's] clinical condition." Among these alternatives are one-to-one and group psychotherapy, neuropsychological testing, and additional consultation, none of which are nearly as intrusive as the forced administration of prolixin. In his IPA, Fisher

also states his belief that Donaldson suffers from "anti-social personality disorder," not a psychotic illness requiring treatment with antipsychotic drugs: There is "no evidence of paranoid affect.... *It is my impression that Mr. Donaldson is manipulating to make it appear as though he is mentally ill.*" IPA at 5 (emphasis added). Fisher nevertheless concluded that the forced administration of antipsychotic medication is the least intrusive therapy available and is necessary to prevent Donaldson's long-term deterioration.[5]

Additionally, in light of Fisher's IPA, dated July 31, 1992, his affidavit, sworn to only three days later on August 3, appears incredible. The affidavit, a single-page, pre-printed document containing blank spaces for names, dates, and a doctor's signature, affirms the presence of the four *Medina* factors necessary for forced medication. If anything, this affidavit lessens the clarity of the record because it is in direct conflict with Fisher's examination report completed, apparently, on the very same day and there is no evidence whatsoever to explain Fisher's abrupt change of opinion.[6]

Given the record before the district court, I do not believe there exists "clear and convincing" evidence that Donaldson is threatened by a significant and likely long-term deterioration in his mental condition but, rather, that he is being subjected to a course of action designed to meet a "goal"

to supplant the second factor in *Medina*, i.e., proof that treatment is necessary to prevent a significant and likely long-term deterioration in Donaldson's mental condition. Answer to Show Cause Order, at 8. The issue of whether such a prosecutorial or public interest is sufficient is not before us.

4. Fisher testified psychotic illnesses are thought disorders frequently characterized by paranoia, delusions, and breaks with reality.

5. Despite testifying that "by definition, his [medical] history ... is extremely important," Fisher did not obtain Donaldson's past medical records. For many of his treatment decisions about Donaldson, Fisher relied upon statements made by Donaldson himself—the very patient Fisher characterized as incompetent. In ascertaining the appropriate dosage of prolixin to be administered to Donaldson, Fisher relied upon

Donaldson's recollection that he was administered 1500mg per day, roughly four times that given to most psychotic patients.

6. At the hearing, Fisher indicated that he changed his diagnosis based on observations by the ward staff. However, if we are to believe Fisher's affidavit, then his change of mind had to have occurred between his completion of the IPA dated July 31 and his execution of the affidavit, which was submitted by cover letter bearing the very same date, Friday, July 31. In my view, it is highly doubtful that Fisher had much opportunity for staff discussions in that short period of time. Thus, we are left with no plausible rationale for this crucial change of opinion, on which the district court so heavily relied.

of bringing him to competency for trial.[7] Additionally, it is not patently clear that he suffers from a psychotic illness. Therefore, forced treatment by prolixin cannot be the least intrusive treatment available.

### B.

The final *Medina* factor requires that the state prove that the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.[8] This factor essentially mandates that prior to issuing such an order, the court must determine that the patient's health interest is better served by being forced to take antipsychotic medication. The district court found that Donaldson's medical need for treatment did override his interest in refusing treatment.

The substantial and debilitating side effects of prolixin accentuate Donaldson's interest in refusing treatment. Of chief concern among these unwanted affects is tardive dyskinesia, a well-documented, incurable condition characterized by involuntary movements of the tongue, lips, and jaw. In its most severe form, tardive dyskinesia may interfere with all motor activity, making speech, swallowing, and breathing extremely difficult. *See Medina*, 705 P.2d 961 at 968 n. 3. Tardive dyskinesia is particularly dangerous because it is irreversible and its symptoms frequently do not occur until late in the course of treatment. Furthermore, it is difficult to predict who will suffer from the condition, and it strikes a relatively large percentage (10–40%) of those patients subjected to high dosages of antipsychotic medication for extended periods.[9] *See id.*

According to Fisher's testimony, Donaldson has already suffered a serious reaction to treatment with antipsychotic drugs. At the hearing, Fisher read from the report of the nurse who treated this reaction: "On August 6, while in the dining room [Donaldson] began clutching his throat. His right jaw was distorted, his tongue abnormally contracted. The patient stated 'I can barely talk. I can't swallow.'" The attending nurse immediately administered cogentin by intramuscular injection, the most rapid emergency procedure available to ward off side effects. Though Fisher concluded that Donaldson feigned this reaction in order to avoid further treatment, his conclusion is not convincing in light of the fact that Fisher did not observe the reaction. Fisher described the nurse who did observe and treat Donaldson's reaction as "very responsible and reliable" and stated the nurse indicated no sign of malingering.[10]

In addressing the specific risk of tardive dyskinesia to Donaldson, the court stated "[t]his is not the type of situation with long-term medication, that if continued would be a serious problem. That type of problem, the doctor has indicated, is [limited to] the people who take this in high

---

7. In *Medina* we instructed courts faced with petitions such as this to consider "[t]he patient's actual need for the medication. To this end the court should focus on the nature and gravity of the patient's illness, the extent to which the medication is essential to effective treatment, the prognosis without the medication, and whether the failure to medicate will be more harmful to the patient than any risks posed by the medication." *Medina* at 973.

8. The majority recognizes that involuntary treatment with antipsychotic medication constitutes a severe infringement on a patient's liberty interest under the Due Process Clause of the United States and Colorado Constitutions. *See Riggins v. Nevada*, —— U.S. ——, ——, 112 S.Ct. 1810, 1814, 118 L.Ed.2d 479 (1992); *Washington v. Harper*, 494 U.S. 210, 221, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178; *People v. Medina*, 705

P.2d 961, 967 (Colo.1985). Additionally, we have recognized a common law right and statutory scheme which permit a person to refuse medication "that poses a significant risk" to a patient's "physical well-being." *See Medina*, 705 P.2d 961, 967–68.

9. Another potentially grave side effect of prolixin is neuroleptic malignant syndrome. According to Fisher, neuroleptic malignant syndrome is a potentially fatal side effect which is characterized by muscle rigidity.

10. The nurse's confidence in the credibility of Donaldson's reaction is further bolstered by the fact that she administered the antidote, cogentin, by intramuscular injection, the faster method of treatment, despite the fact that an oral alternative exists.

doses for long periods of time and are older people." However, based on the record before us, this finding simply establishes that Donaldson is among those at high risk. Fisher testified that in the past Donaldson has been exposed to high dosages, approximately four times higher than that administered during the "acute phase" of psychosis.[11] Simply because this state did not administer antipsychotic drugs to Donaldson in the past, this in no way lessens the district court's duty to consider the risk of tardive dyskinesia in its analysis of Donaldson's liberty interest.

While it is true that the district court approved a limited treatment plan reducing the dosage and mandated a future review hearing to determine the success of the treatment and the hospital's ability to control anticipated side effects, these precautions do not render Donaldson immune from these potentially fatal effects. In light of the debilitating and potentially fatal side effects, Donaldson's documented reaction, and the lack of evidence regarding prolixin's therapeutic value as applied to Donaldson,[12] I do not believe the evidence as a whole is sufficient to support a conclusion by any reasonable person that Freddie Donaldson's health interest will be better served by the forced administration of prolixin.[13]

## II.

In reviewing the decision of the district court, we must determine if the court abused its discretion in holding that the state provided "clear and convincing" evidence that the factors discussed in *Medina*

were met. Clear and convincing evidence is proof which persuades the trier of fact that the truth of the contention is highly probable. It is stronger than a preponderance of evidence and is unmistakable and free from serious or substantial doubt. *See People v. Taylor*, 618 P.2d 1127, 1136 (Colo.1980); *DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318, 323 (1980); Colorado Jury Instructions, 3:2 (2d ed).

Here, the court appropriately based its holding on the testimony of Dr. Fisher. However, since he is the only witness, his testimony should be examined in its entirety. Fisher testified that Donaldson suffered from paranoid schizophrenia, then admitted that he originally ruled out psychotic disorders, and was uncertain as to the nature of Donaldson's illness. Fisher also testified that Donaldson's condition will deteriorate without antipsychotic medication, but when questioned as to specifics, he stated that his "goal" was to restore Donaldson to competency. Fisher based much of his opinion on the patient's comments about his past medical experience, yet Fisher never obtained Donaldson's medical records.

In light of the critical liberty interest at stake and the uncertainty as to the effectiveness of the treatment when measured against the irreversible and potentially fatal risks involved, I believe, on this record, the state failed to meet its burden.[14] Under the record before us, I am obliged to conclude that no reasonable person could be without "serious or substantial doubt" as to whether the state provided sufficient

---

**11.** Since Fisher failed to obtain Donaldson's medical records, there is no basis for assuming Donaldson has not been exposed to "high doses for long periods of time."

**12.** In *Medina*, we stated that the "therapeutic value of antipsychotic medication depends upon the existence of a trusting relationship between the patient and the psychiatrist," *Medina* at 970, n. 6, and that a "vital component of any effective treatment program" is a patient's willingness to submit to treatment. *Id.*

**13.** We previously held that forced medication is only "sufficiently compelling" when "the prognosis without treatment is so unfavorable that the patient's personal preference must yield to

the legitimate interests of the state in preserving the life and health of the patient." *Medina* at 974.

**14.** It should be clear that, first and foremost, we are not substituting our judgment for the expertise and judgment of Fisher, the staff psychiatrist, but applying legal requirements to the actions of the district court. And, second, nothing I would have the court hold today prevents the state from returning to the district court with new information to seek a subsequent authorization to forcibly administer prolixin to Donaldson.

evidence to meet our test announced in *Medina.*

I respectfully dissent.

I am authorized to say that Justice LOHR joins in this dissent.